UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| LISA N. McCLELLAN | ) | |
| | ) | |
| V. | ) | NO. 2:15-CV-221 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. The plaintiff's application for Disability Insurance Benefits under the Social Security Act was administratively denied following a hearing before an Administrative Law Judge ["ALJ"]. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 14], while the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 19].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff filed an earlier suit in this Court seeking these benefits, *McClellan v. Colvin* No. 2:13-CV-199, (E.D. Tenn. 2013). In that earlier case, the ALJ found that the plaintiff could perform light work with some environmental restrictions and mental limitations. The claim was remanded to the Commissioner for "further evaluation of the plaintiff's RFC, noting that her insured status expired December 31, 2012." *Id*, Doc. 26. The circumstances of that remand will be discussed further on in this report and recommendation.

Plaintiff was born on November 2, 1961, and was 51 years of age, an individual closely approaching advanced age under the Social Security regulations, at the time her insured status expired on December 31, 2012. She has a high school education. There is no dispute that she cannot perform any of her past relevant work. She must establish that she was disabled on or prior to the expiration of her insured status. *Moon v. Sullivan,* 923 F.2d 1175, 1182 (6th Cir. 1990).

Plaintiff's medical history is summarized in the Commissioner's brief as follows:

> Plaintiff reported at least a 10-year history of back pain prior to her alleged onset date (Tr. 213). A magnetic resonance imaging (MRI) scan of

Plaintiff's lumbar spine in February 2004 revealed a shallow broad-based degenerative disc protrusion at L4-L5-S1, a mild central canal stenosis at L2-L3-L4, and a minor degenerative anular disc bulge at L3-L4 (Tr. 599-600). There was no evidence of disc extrusion, high grade central canal stenosis, or nerve root compression at any level (Tr. 600).

On June 3, 2010, Plaintiff told Amylyn Crawford, M.D., her primary care physician, that she was unable to work; she previously work as a beautician but was unable to stand for long due to back and knee pain (Tr. 185). Despite Plaintiff's reports of pain, Dr. Crawford did not examine her joints, bones, or muscles or inspect for pain, range of motion, stability, strength, or tone (Tr. 185). Dr. Crawford prepared a letter indicating that she followed Plaintiff for multiple conditions, and related Plaintiff's report that she was "unable to work as a hairdresser any longer because of her back, hips and knees and the prolonged standing" (Tr. 180). Shortly thereafter, an x-ray of Plaintiff's knee demonstrated mild joint space narrowing in the medical compartment bilaterally (Tr. 185, 188). Dr. Crawford questioned whether Plaintiff had "slight OA" (Tr. 188).

On August 18, 2010, Samuel Breeding, M.D., performed a physical consultative examination of Plaintiff (Tr. 212-19). Plaintiff reported that she had never received disability benefits, but she had applied three times in the past (Tr. 212). She alleged disability due to: mental impairments; emphysema; arthritis and joint pain in her hips, knees, and back; and muscle spasms (Tr. 212-13). Plaintiff told Dr. Breeding that the "main reason" she could not work was due to her anxiety and depression, but that her arthralgias made it difficult for her to stand and bend in her job as a hair stylist (Tr. 214). Upon physical examination, Plaintiff had a normal range of motion in all major joints, normal reflexes, no sensory deficits, and full strength in all major muscle groups (Tr. 214). Her lungs were clear to auscultation and percussion bilaterally (Tr. 213). Dr. Breeding observed Plaintiff's gait was normal, but slightly slow (Tr. 213). She did not use an assistive device (Tr. 213). He opined that during an 8-hour workday, Plaintiff could lift 35 pounds occasionally, sit for 4 to 6 hours, stand for 2 to 4 hours, and "may need to sit or stand as needed for comfort" (Tr. 214). Plaintiff's chest x-ray showed no active cardiopulmonary disease (Tr. 215).

On October 4, 2010, Plaintiff told Robert Houghton, Ph.D., her treating mental health provider, that she had no symptoms of depression and was sleeping well (Tr. 754). He assessed Plaintiff's condition as stable and noted her bipolar disorder was in remission (Tr. 754).

On October 5, 2010, Plaintiff told Dr. Crawford she had "been walking the dog a little bit" and had "trouble with spasms in back after [she] did 2 haircuts in a row (on family)" (Tr. 236). She reported that her pain medication worked well (Tr. 236). Dr. Crawford noted no clinical findings related to Plaintiff's pain allegations and refilled her medications (Tr. 236).

On October 28, 2010, at the initial level, State agency medical consultant Karla Montague-Brown, M.D., opined that during an 8-hour workday, Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently,

stand and walk for about 6 hours, and sit for about 6 hours (Tr. 227). She could frequently climb, balance, stoop, kneel, crouch, and crawl (Tr. 228). She was to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 230). She concluded that the medical records and objective findings were not fully supportive of the severity of Plaintiff's alleged limitations (Tr. 231), or of the limitations in Dr. Breeding's assessment (Tr. 232).

On January 19, 2011, Plaintiff went to the emergency room after falling and injuring her right knee (Tr. 2143). Her physical examination was normal except for the strain to her right knee (Tr. 243-44). X-rays of her right knee demonstrated medial spurring, but no acute injury or significant joint space narrowing (Tr. 245). Plaintiff was diagnosed with knee strain and prescribed pain medication (Tr. 244).

Plaintiff returned to Dr. Houghton on January 24, 2011 for medication management (Tr. 753). She had unilaterally increased her medications, and Dr. Houghton instructed her to reduce them (Tr. 753). He noted she walked with a limp, wincing as she did so (Tr. 753).

On February 3, 2011, Plaintiff told Dr. Crawford that she had gone to emergency room after she hurt her knee and had been using a cane, which helped take pressure off her back (Tr. 247). Dr. Crawford recorded Plaintiff's subjective reports, including that she only showered weekly, went grocery shopping weekly and used a grocery cart for support, and needed her husband to help her wipe her bottom (Tr. 247). Her treatment notes did not reflect any correlating findings on examination, though there were other positive findings, including increased blood pressure, some swelling in her lower extremities, and bumps under her arms and chest (Tr. 247). Dr. Crawford's instructed Plaintiff to continue using her medications and cane (Tr. 247). She completed the form for a handicap tag for Plaintiff (Tr. 247), and she wrote that Plaintiff used a cane for her arthritis and degenerative joint disease (Tr. 248).

On March 23, 2011, at the reconsideration level, Reeta Misra, M.D., found that there was no evidence of significant change in Plaintiff's condition (Tr. 251). She affirmed the prior physical RFC as written (Tr. 251).

On April 28, 2011, Plaintiff walked "very unsteadily and slowly" into Dr. Houghton's office and reported that she walked better with her cane (Tr. 273). She was upset, depressed, and anxious because she did not get approved for disability (Tr. 273). Dr. Houghton noted Plaintiff was stable, continued her medications, and instructed her to return in three months (Tr. 273).

On May 25, 2011, Donna Abbott, M.A. (senior psychological examiner) and B. Wayne Lanthorn, Ph.D. (licensed clinical psychologist), performed a psychological consultative examination of Plaintiff (Tr. 252-58). She drove herself to the appointment and appeared clean and groomed, with styled hair, groomed eyebrows, and groomed fingernails (Tr. 252). She reported she could not sit or stand for very long due to pain, although her "medications did help her considerably" (Tr. 253-54). Upon examination, Plaintiff was appropriately

oriented, conversational, and very talkative (Tr. 254). Her memory processes were intact and she could attend, concentrate, and follow directions (Tr. 254). Her affect was basically appropriate, and mildly depressed at best; she did not appear anxious, restless, or fidgety (Tr. 254). Dr. Lanthorn observed that Plaintiff walked slowly with a cane (Tr. 254).

In describing her daily activities, Plaintiff stated she went to Narcotics Anonymous meetings and attended church, did dishes and housework, and occasionally drove to visit her daughter who lived four hours away (Tr. 255). Dr. Lanthorn administered several tests and indicated Plaintiff's "overall effort seemed marginal" and she "did not put forth her best effort" (Tr. 254, 256). He noted Plaintiff answered some questions correctly but later changed her responses to make them incorrect or missed easier items and correctly answered more difficult ones (Tr. 256). Her malingering index was significantly elevated (Tr. 257). Her responses suggested Plaintiff tended to portray herself in an especially negative or pathological light (Tr. 257). Dr. Lanthorn assessed alcohol and cocaine abuse in sustained full remission by her report and adjustment disorder with depressed mood, mild (Tr. 257). He opined that she had moderate limitations in her ability to respond appropriately to usual work situations and to changes in a routine work setting (Tr. 262). In all other areas of work-related activities, Plaintiff had mild limitations or no limitations (Tr. 261-62).

On May 5, 2011, Plaintiff told Dr. Crawford that she had been denied disability and reiterated her inability to perform her activities of daily living due to pain (Tr. 266). Dr. Crawford did not note any objective findings related to Plaintiff's subjective complaints (Tr. 266). She continued Plaintiff's medications as before "for now," noting that she was appealing her disability denial (Tr. 266).

On August 11, 2011, Plaintiff told Dr. Crawford that her hips, back, knees, and feet hurt "all the time" and that it was hard to walk or stand (Tr. 265). She could not wash dishes, do her own laundry, or vacuum (Tr. 265). Upon physical examination, Dr. Crawford observed that Plaintiff's gait was antalgic and she walked with a cane (Tr. 265). She also observed that Plaintiff was slow to change position (Tr. 265). She continued Plaintiff's pain and anti- inflammatory medications (Tr. 265).

Plaintiff cancelled mental health treatment appointments in August and September 2011 (Tr. 271-72). In October 2011, Plaintiff told Dr. Houghton that she was "doing pretty well," and denied any depression (Tr. 270). Dr. Houghton wrote that she was stable, continued her medications, and instructed her to follow up in six months (Tr. 270).

On January 18, 2012, Plaintiff reported numerous subjective pain symptoms to Dr. Crawford (Tr. 290-93). A nurse took Plaintiff's vital signs, but Dr. Crawford made no mention of any physical examination or corroborating objective findings (Tr. 292-93). A January 2012 MRI scan of Plaintiff's lumbar spine showed that a previously observed protrusion at L4-L5 from February 2004 had resolved (Tr. 287-88). She had osteoarthritis involving the facet joints

bilaterally at L4-L5-S1, but no significant central spinal stenosis (Tr. 288). There was a new mild disc protrusion at the L1-L2 level (Tr. 288). Dr. Crawford referred Plaintiff to neurosurgery for an evaluation (Tr. 288).

Also in January 2012, Dr. Houghton wrote that since 2003, Plaintiff had been treated at his practice for bipolar disorder, panic disorder with agoraphobia, and a history of polysubstance dependence, in remission (Tr. 297). He noted that she had at least 20 years of treatment for her psychiatric condition (Tr. 297). Although Plaintiff had been treated with a variety of modalities over the years, he provided only medication management every three to six months (Tr. 297). That month, Dr. Crawford also completed a letter that listed Plaintiff's multiple medical concerns, and indicated Plaintiff was scheduled for evaluation by a neurosurgeon (Tr. 299).

On January 27, 2012, Larry Hartman, M.D., a neurosurgeon, evaluated Plaintiff's low back pain (Tr. 580-83). Plaintiff reported a 15-year history of low back pain and bilateral lower extremity pain with some numbness and tingling (Tr. 580). She told Dr. Hartman that she had not worked for a number of years and had been trying to get on disability for more than four years (Tr. 580). She asked Dr. Hartman if he could make some findings to take to disability to assist her case (Tr. 580). Dr. Hartman summarized Plaintiff's medications and noted she had not received any physical therapy or oral or epidural steroids (Tr. 580). He observed that Plaintiff's pain drawing was "really quite impressive" as she described numbness and paresthesias in all four extremities, the upper extremities distal to the elbow, and the entire length of both extremities as well as a stabbing pain across her back and in both hips (Tr. 581).

However, physical examination revealed a well-developed patient in no acute distress (Tr. 581). She was 65 inches tall and weighed 288 pounds (Tr. 581). She had a substantially diminished range of motion of the lumbar spine, producing back pain only (Tr. 581). Straight leg raise testing in the sitting position produced back pain only, but with recumbency she produced both back pain and "apparent lower extremity pain" at around 80 degrees (Tr. 581). Examination of the extremities revealed no atrophy, cyanosis, or ecchymosis (Tr. 581). Her motor examination was intact and symmetric in both extremities (Tr. 582). He concluded that Plaintiff's pain was largely myofascial (Tr. 582). He recommended conservative management, including physical therapy and the use of a muscle relaxant (Tr. 582). He stated Plaintiff would not likely benefit from surgery (Tr. 582).

In March 2012, Plaintiff told Dr. Houghton that she was depressed and worried about everything, particularly since being denied disability (Tr. 637). Dr. Houghton did not change her medications, as he determined her condition was stable (Tr. 637).

On April 5, 2012, Plaintiff reported hip and low back pain to Dr. Crawford (Tr. 629). On June 7, 2012, Plaintiff reported right knee pain and severe hip pain (Tr. 624). Dr. Crawford performed trochanteric bursa injections into both hips in April and June (Tr. 625, 629). She referred Plaintiff back to physical therapy at

both visits as well (Tr. 625-26, 629-30).

On July 25, 2012, Plaintiff reported right knee pain to Dr. Crawford (Tr. 620). She instructed Plaintiff to continue with her medications and assessed likely tendonitis with underlying osteoarthritis (Tr. 622). Imaging of the right knee revealed mild arthritic changes with no acute abnormality (Tr. 592).

The next day, Eric Parks, M.D., an orthopedist, examined Plaintiff's complaints of right knee pain (Tr. 743). She reported it started after she was kneeling at church (Tr. 743). Upon examination, Plaintiff's right knee had normal alignment (Tr. 743). She had "diffuse tenderness to palpation throughout the entire knee out of proportion" (Tr. 743). There was no palpable joint effusion, erythema, or warmth (Tr. 743). Range of motion was to 110 degrees before a soft painful endpoint (Tr. 743). There were no instability or neurovascular deficits (Tr. 743). Dr. Parks reassured Plaintiff on the nature of her symptoms and recommended she get started on some therapy (Tr. 744). A few weeks later, Dr. Parks noted Plaintiff continued to have some right knee pain and had not gone to therapy yet (Tr. 742). Upon examination, she had some right knee tenderness, but she retained full range of motion (Tr. 742). She ambulated with a mildly antalgic gait using assistance (Tr. 742). Dr. Parks injected Plaintiff's right knee and encouraged her to attend physical therapy (Tr. 742).

In September 2012, Plaintiff reported to Dr. Houghton that she was depressed and that her pain treatment was only partially effective (Tr. 636). She stated that the only way her pain was relieved was by lying down (Tr. 636). Dr. Houghton observed that she walked carefully and slowly with a cane, wincing as she did so (Tr. 636). Dr. Houghton assessed her mental impairments as stable (Tr. 636).

On October 2, 2012, Plaintiff told Dr. Parks she was doing great (Tr. 741). The injection helped 80 percent on the right knee (Tr. 741). Examination revealed very mild tenderness of her right knee (Tr. 741). She had full range of motion with crepitus (Tr. 741). She was ambulating with a mildly antalgic gait using a cane (Tr. 741). Dr. Parks remarked that Plaintiff could continue with the cane as needed for assistance (Tr. 741).

On October 4, 2012, Plaintiff told Dr. Crawford that she continued to have constant, aching, and sharp pain (Tr. 615). Associated symptoms included crepitus, decreased mobility, joint tenderness, limping, popping, and tingling in the arms and legs (Tr. 615). Plaintiff reported that she went to one physical therapy appointment, was miserable, could not walk for three days, and did not return (Tr. 615). Upon physical examination, Dr. Crawford noted some edema in Plaintiff's extremities, but no other objective findings related to her pain complaints (Tr. 617). She instructed Plaintiff to reschedule with physical therapy and to continue her medications and topical patches (Tr. 617-18). She again counseled Plaintiff about tobacco cessation (Tr. 618).

On September 13, 2013, at the initial level of Plaintiff's subsequent application, Carol Lemeh, M.D., opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for 6 hours, and sit

> for 6 hours (Tr. 418). She was limited to frequent pushing and pulling with her right knee (Tr. 418). She could never climb ladders, ropes, or scaffolds, but could occasionally perform other postural maneuvers (Tr. 418-19). She was to avoid concentrated exposure to some environmental conditions (Tr. 419).
>
> On December 16, 2013, at the reconsideration level of Plaintiff's subsequent application, Thomas Thrush, M.D., opined that during an 8-hour workday, Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for 6 hours, and sit for 6 hours (Tr. 437). She could never climb ladders, ropes, or scaffolds, but could occasionally perform other postural maneuvers (Tr. 437). She was limited to frequent pushing and pulling with her right knee and was to avoid concentrated exposure to some environmental conditions (Tr. 437).
>
> On November 13, 2014, Dr. Crawford opined that it was reasonable to conclude that Plaintiff would require the use of a cane on a regular basis (Tr. 757). She noted Plaintiff had displayed symptoms of fatigue, knee pain, back pain, and general myalgia during the previous 15 months of treatment (after Plaintiff's date last insured) (Tr. 757). She reported that Plaintiff met the definition of a disabled driver due to her inability to ambulate 200 feet without stopping to rest (Tr. 757). She did not believe Plaintiff could stand or walk more than two hours during an eight-hour workday (Tr. 757). She believed Plaintiff's description of her symptoms to be credible based on her treatment history of Plaintiff (Tr. 757).
>
> On November 26, 2014, Michelle Flanagan, a certified physician's assistant, completed a fibromyalgia assessment, noting that she began treating Plaintiff in February 2014 and last saw Plaintiff in October 2014 (Tr. 745-46). She reported Plaintiff experienced widespread pain and fatigue, noted multiple self-reported symptoms, and opined that Plaintiff would miss more than two days of work per month and would need unscheduled work breaks (Tr. 745-76).

[Doc. 20, pgs. 3-12].

On May 28, 2015, the ALJ held the administrative hearing which followed the remand. Plaintiff and a friend, Beverly Howard, testified regarding plaintiff's abilities and her activities. The ALJ then called Dr. Bentley Hankins, a vocational expert ["VE"]. The ALJ asked Dr. Hankins a series of hypothetical questions. First, he was asked to assume a person who had the residual functional capacity opined by Dr. Karla Monague-Brown, M.D., a State Agency doctor who examined the plaintiff's records as of October

28, 2010. Dr. Brown opined that the plaintiff could perform light work, except that she could not be around fumes because of her emphysema (Tr. 227-234). The VE identified several jobs such a person could perform (Tr. 345-346). If plaintiff also had the mental limitations opined by Dr. Lanthorn (Tr. 261-262), the VE opined that this would "would not ordinarily prevent" a person from performing the jobs he had previously identified (Tr. 346-347). If the plaintiff had the limitations of function opined by Michelle Flanagan, plaintiff's treating physician's assistant (Tr. 745-746), Dr. Hankins opined that there would be no jobs (Tr. 347-348). Likewise, if plaintiff was impaired in the manner opined by Dr. Crawford on November 13, 2014 (Tr. 757), such as being unable to be on her feet for more than two hours out of an eight hour workday, and needing to use a "hand-held assistive device for ambulation," any jobs would have to be at the sedentary level, and he believed "the grid rules would be in effect in that instance." (Tr. 349). In other words, he believed that under the Medical-Vocational Guideline rules, she would be disabled as a matter of law.

On June 5, 2015, the ALJ rendered his hearing decision. He found that the plaintiff had severe impairments of fibromyalgia, arthritis, chronic obstructive pulmonary disease, obesity, and an affective mental disorder (Tr. 306). He found that her complaints of urinary frequency, sleep apnea, and high blood pressure were not severe impairments. He also found that surgery to remove a pelvic mass in April 2014 did not result in a severe impairment (Tr. 306). He found that her conditions did not meet nor equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the regulations (Tr. 306). In

making this determination, he opined that plaintiff had only mild restrictions in activities of daily living and social functioning. He found that she had moderate limitations in concentration, persistence or pace, and no episodes of decompensation (Tr. 307).

He found that plaintiff had the residual functional capacity for light work, limited to no more than frequent climbing, balancing, stooping, kneeling, crouching, and crawling; and that she should avoid exposure to fumes, odors, dusts, gases and poor ventilation. Mentally he found the plaintiff had more than a slight limitation in her ability to respond to normal work situations and changes, but was able to function satisfactorily (Tr. 308).

The ALJ then described the plaintiff's testimony and her credibility, as well as the testimony of Ms. Howard, plaintiff's friend. He then stated that while he found plaintiff had some medically determinable impairments, her statements regarding their limiting effects was not completely credible (Tr. 309). In this regard, he discussed Dr. Breeding's findings during the consultative exam and his restrictions he gave regarding standing and walking in August 2010, noting plaintiff told Dr. Breeding her main reason for being unable to work was due to anxiety and depression. He mentioned the treatment given by her treating physician, Dr. Amylyn Crawford, noting it was generally conservative with no surgery recommended at any time. He discussed the MRIs in 2004 and 2012. He noted that the latter MRI showed improvement in disc bulges from the previous MRI, but the development of osteoarthritis. He stated that Dr. Crawford referred plaintiff to a neurosurgeon in 2012, but upon examination the surgeon prescribed conservative care

and physical therapy, finding that plaintiff would not likely benefit from surgery (Tr. 310).

He discussed the plaintiff's COPD and history of conservative care by Dr. Crawford who noted that plaintiff continued to smoke even with the diagnosis of COPD. He discussed plaintiff's obesity, and found that her impairments were made worse by her high weight (Tr. 310).

The ALJ noted that Dr. Crawford's "records generally lack objective findings supporting" the plaintiff's alleged limitations. He stated that Dr. Crawford had supported the plaintiff's attempt to obtain disability and had written several letters on her behalf. He mentioned Dr. Crawford's treating physician statement (Tr. 757) "opining that it was reasonable to conclude that she [plaintiff] would require the use of a cane on a regular basis…," and that plaintiff "met the definition of a disabled driver due to her inability to ambulate 200 feet without stopping to rest." (Tr. 311). The ALJ also noted that Dr. Crawford "did not prescribe the cane." *Id*. He also mentioned Ms. Flanagan's opinion that plaintiff would miss more than two days of work per month and have to take unscheduled breaks at work. *Id*.

He then discussed the plaintiff's treatment history for her mental condition at Frontier Health and that the records generally showed she was stable. (Tr. 311). He then described Dr. Lanthorn's evaluation of the plaintiff in detail, pointing out the examiner's feeling that the plaintiff was attempting to malinger. (Tr. 311-312).

After restating his RFC finding, the ALJ discussed the weight he gave to the

various medical and psychological sources. He gave great weight to Dr. Lanthorn and Dr. Monague-Brown, the State Agency physician on which the physical RFC was based. He only gave some weight to the State Agency psychologists. Likewise, he only gave some weight to Dr. Breeding, but found Dr. Breeding's asserted limitations on the plaintiff's ability to stand and walk was not consistent with his examination of the plaintiff, which showed normal strength and a full range of motion (Tr. 31). He gave little weight to the State Agency physicians who evaluated the plaintiff's medical records in September and December of 2013 and found a more reduced level of light work than that in their RFC finding because "the objective evidence available at the time indicated no more than mild abnormalities inconsistent with the plaintiff's subjective complaints." (Tr. 312).

He also gave little weight to Dr. Crawford stating her opinions were not consistent with the objective evidence and were apparently based on the plaintiff's subjective complaints. He then stated the following:

> that the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(Tr. 312-313). With regard to Ms. Flanagan's opinions regarding plaintiff's fibromyalgia, he found that she did not see the plaintiff before February 2014, well over one year after the plaintiff's insured status expired, and the report did not attempt to state that it applied to the period before December 31, 2012 (Tr. 313).

Further discussing his opinion regarding the plaintiff's lack of credibility, the ALJ stated that while she described very limited daily activities, he did not consider them as strong evidence of disability. First, he noted the daily activities "cannot be objectively verified with any reasonable degree of certainty." (Tr. 313). Second, even if the daily activities were limited to the extent plaintiff claimed, he found it difficult to attribute that degree of limitation to plaintiff's medical condition because "of the relatively weak medical evidence" supporting those limitations. (Tr. 313). He also noted the instances where Dr. Lanthorn felt the plaintiff was not putting forth a full effort, and testing showed malingering. Also he mentioned the treatment note of Dr. Eric Parks on July 26, 2012, in which he noted that plaintiff showed "diffuse tenderness to palpation throughout the entire knee *out of proportion*." (Tr. 743)(emphasis added). Dr. Parks also noted "no instability" in the knee (Tr. 743). The ALJ also noted, (Tr. 313), that plaintiff went back to Dr. Parks on August 9, 2012, using a cane for "assistance." (Tr. 742).

As for Ms. Howard, the ALJ gave her testimony little weight because "the objective evidence does not support her testimony." (Tr. 313).

Based upon the testimony of the VE in response to the question based on the opinion of State Agency physician Dr. Montague-Brown, he found that there were a

significant number of jobs the plaintiff could perform. Accordingly, he found that she was not disabled (Tr. 314-315).

Before discussing the plaintiff's assignments of error, the Court notes as stated above that this case was remanded to the Commissioner for further review after a previous hearing decision was entered by the ALJ denying benefits. *McClellan v. Colvin* No. 2:13-CV-199, (E.D. Tenn. 2013). In Doc. 23 in that case, this Court's report and recommendation noted that the plaintiff asserted the ALJ erred in his RFC finding because he did not properly consider the plaintiff's use of a cane, and also that he also erred in finding the plaintiff to not be fully credible in her subjective complaints.

With respect to plaintiff's credibility in that case, the prior report and recommendation stated that:

> In *general*, the Court finds no fault with the ALJ's credibility determination. He based his finding that she was not credible beyond the determined RFC upon the examination of Dr. Breeding, Dr. Crawford's seeming lack of objective findings, and the fact Dr. Lanthorn's findings regarding exaggeration of symptoms, inconsistent effort and malingering found during his mental exam. Regarding the latter, there is no reason why a fact finder could not take into account prevarication about *mental* symptoms in determining a person's credibility regarding *physical* symptoms. Also, the ALJ gave valid reasons for doubting the plaintiff's self-reported lack of daily activities.

[Doc. 23, pgs. 6-7].

The remand was recommended due to the plaintiff's assertion that the RFC finding in the earlier decision was flawed because it did not take into account the purported need of the plaintiff to use a cane for basic ambulation. This Court found that

> *[t]he ALJ did not address the plaintiff's use of a cane in the decision*, even though it was mentioned in several reports in

> the record, including Dr. Crawford's. The legitimate need to use a cane would have an enormous impact upon the ability to meet the standing and walking requirements of light work…Whether it is medically necessary for plaintiff to use a cane or other assistive device is an issue for the ALJ to deal with, not this Court.

*Id.* at pg. 8. (Emphasis added). In other words, this Court wanted to be sure that the ALJ was aware that plaintiff was using a cane, for him to evaluate and address in the decision whether it was a medical necessity, and to determine at that point if he still was of the opinion that she could meet the standing and walking requirements of light work.

In the present case, plaintiff asserts that the ALJ did not give proper weight to the opinion of Dr. Crawford, the plaintiff's treating physician, when she opined that the plaintiff was limited to no more than two hours of standing or walking in an eight hour workday. Also, the plaintiff asserts that the ALJ did not properly evaluate the plaintiff's credibility.

As stated by the plaintiff in her well written brief, the ALJ is required to give controlling weight to the opinions of treating physicians if the opinion is well supported and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This is because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §416.927(c)(2), and *Blakely v. Comm'r of Soc. Sec.*,

581 F.3d 399, 406 (6th Cir. 2009). If the ALJ finds that the treating physician's opinion is not entitled to controlling weight, the ALJ must determine what weight to give the opinion based upon the length, nature, and extent of the treatment relationship; the supportability of the physician's opinion and the opinion's consistency with the rest of the record, and the physician's specialization. *Wilson, supra*, at 544.

The ALJ obviously did not give Dr. Crawford's opinion controlling weight, and in fact, gave it little weight. Plaintiff asserts that Dr. Crawford's opinion was not inconsistent with the other medical evidence, and that was not inconsistent with her own treatment notes.

The ALJ elected to give Dr. Crawford's opinion little weight because he found it was, in fact, inconsistent with the objective medical evidence, and was based in large part on plaintiff's subjective complaints. It is true that Dr. Crawford has opined that the plaintiff's physical impairments prevent her from meeting the standing and walking requirements of light work. It is also true that Dr. Crawford has noted several times the plaintiff's assertions of very severe pain, inability to ambulate, and the fact that the plaintiff began using a cane, the use of which Dr. Crawford endorsed.

With respect to consistency with other substantial evidence in the record, all of the other medical opinions are to the effect that plaintiff can either stand and/or walk for six hours (all of the State Agency physicians), or for at least four hours (Dr. Breeding). However, as pointed out by the Commissioner, there is other objective medical evidence to support not giving Dr. Crawford controlling weight. The February 2004 MRI scan of

the plaintiff's lumbar spine showed only a mild disc bulge with no associated nerve root compression at any level (Tr. 599-600). This disc protrusion had resolved by the time of a second MRI on January 9, 2012. Although there had been development of osteoarthritis, no spinal stenosis was seen. Also, a new "mild" disc protrusion was noted. (Tr. 288). These do not provide support for Dr. Crawford's opinion that the plaintiff is a virtual invalid.

Likewise, while plaintiff told Dr. Crawford about having severe pain in doing anything requiring her to be on her feet, and Dr. Crawford's opinions indicate she believed her, Dr. Crawford's own notes do not offer much in the way of objective support for those opinions. As noted by the Commissioner, Dr. Crawford's notes of the various exams she did of the plaintiff "did not note muscle spasms, decreased range of motion, decreased sensation, pain upon palpation, or other object findings that would support Plaintiff's subjective complaints (Tr. 185, 236, 247, 265-66, 290-93, 311, 615-17, 620-22, 624-26, 629-30)." [Doc. 20, pg. 21].

Dr. Crawford, after plaintiff herself purchased a cane and began using it, agreed after the fact that plaintiff should use a cane for support. However, unlike in the first decision, the ALJ addressed the use of the cane, and found that Dr. Crawford's objective findings, the other medical evidence in the record and the continued conservative treatment did not show that it was a medical necessity. This is not an ALJ playing doctor, but forming an opinion as the finder of facts based on the evidence before him.

Also, the ALJ had suspicions regarding whether Dr. Crawford was giving too

much credence to the plaintiff's complaints to her. It is unquestionably true that part of the process of diagnosing and treating illness is listening to a patient and considering their subjective complaints. However, the overall medical evidence and Dr. Crawford's records of what she saw, found or observed indicate that the restrictions which found their way into Dr. Crawford's medical opinions were based largely on those subjective complaints. Also, the ALJ was of the opinion that Dr. Crawford was motivated in part by the plaintiff's frustrations in her attempt to obtain disability. In this regard, Dr. Crawford began treating plaintiff on June 3, 2010, less than a week after the current application was filed on May 27th. The very first note in the record of the first visit states that "Pt reports denied disability on first attempt." (Tr. 185). This recurring emphasis on plaintiff's "disabled" status, combined with the lack of objective findings in her notes as well as the other medical records, could legitimately engender skepticism in the ALJ as trier of fact.

The ALJ's assignment of little weight to Dr. Crawford's opinion is also intertwined with the issue of plaintiff's credibility. Where the limiting factor for a plaintiff is the level of pain experienced in performing work-related tasks, such as standing and walking, credibility is essential. Back pain and fibromyalgia in particular are conditions where the credibility of a plaintiff is the paramount issue. As stated above, Dr. Lanthorn noted malingering and a lack of effort. This would legitimately call Ms. Crawford's credibility in other areas into question. If plaintiff was less than truthful in her dealings with Dr. Lanthorn, the ALJ could certainly suspect that she was not credible with Dr. Crawford regarding the level of pain she felt standing and walking.

With regard to the issue of the plaintiff's credibility in the earlier case, this Court made the finding set forth on page 14 hereinabove. In particular, the existence and degree of malingering and lack of effort noted by Dr. Lanthorn is compelling evidence to support the ALJ's credibility finding. Nothing has occurred, in the opinion of the Court, to change that finding, and it is adopted herein.

Based upon the foregoing, the Court concludes that Dr. Crawford's opinion was not entitled to controlling weight. Also, considering the objective evidence to the contrary under the factors for determining weight to accord a medical opinion set out above, the ALJ did not err in giving it little weight. Additionally, there is substantial evidence to support the ALJ's credibility finding.

There was substantial evidence to support the ALJ's RFC finding, and his finding that the plaintiff could perform a substantial number of jobs. Accordingly, it is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 14] be DENIED, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 19] be GRANTED.[1]

Respectfully submitted,

s/ Clifton L. Corker
United States Magistrate Judge

[1]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).